IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

No. 21-3221

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Appeal from the United States |
| | ) | District Court for the Eastern |
| Plaintiff-Appellee, | ) | District of Wisconsin |
| | ) | |
| v. | ) | Case No. 17-cr-00175 |
| | ) | |
| ROYEL PAGE, | ) | Honorable Michael Y. Scudder |
| | ) | Presiding |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

**SUPPLEMENTAL EN BANC BRIEF**
**OF PLAINTIFF-APPELLEE UNITED STATES**

———————————

GREGORY HAANSTAD
United States Attorney

REBECCA TAIBLESON
Assistant U.S. Attorney

United States Attorney's Office
Eastern District of Wisconsin
517 E. Wisconsin Ave.
Suite 530
Milwaukee, WI 53202
(414) 297-4534

Attorneys for Plaintiff-Appellee

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...............................................................................ii

INTRODUCTION ............................................................................................ 1

STATEMENT OF THE ISSUE ......................................................................... 2

BACKGROUND.............................................................................................. 2

I.    Factual Background........................................................................... 2

II.   Procedural History ........................................................................... 6

ARGUMENT .................................................................................................. 9

The Trial Judge Did Not Plainly Err By Omitting A Buyer-Seller Instruction........ 9

      I.     The Standards For Plain-Error Review Are Demanding And Must Be Applied Consistently. ................................................................ 9

      II.    The Standards For Plain-Error Review Are Not Met Here. ............... 11

            A.    *Prong One*: The District Court Did Not Err, But Some Of This Court's Cases Suggest Otherwise. .............................................. 12

            B.    *Prong Two*: Any Error Was Not "Plain." ................................... 22

            C.    *Prong Three*: There Is No Effect On Substantial Rights. ........... 25

            D.    *Prong Four*: There Is No Serious Effect On Fairness, Integrity, Or Public Reputation Of Judicial Proceedings........................ 28

CONCLUSION................................................................................................ 30

CERTIFICATE OF COMPLIANCE ............................................................. 32

CERTIFICATE OF SERVICE ....................................................................... 33

TABLE OF AUTHORITIES

**Cases** Page(s)

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988) ............................................ 10

*Burks v. United States*, 437 U.S. 1 (1978) ........................................................................ 29

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ................................................................. 25, 27

*Direct Sales Co. v. United States*, 319 U.S. 703 (1943) ......................... 12, 13, 17, 18, 20

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) ..................................................... 21

*Greer v. United States*, 593 U.S. 503 (2021) ........................................... 9, 10, 25, 26, 27

*Johnson v. United States*, 520 U.S. 461 (1997) .................................................... 11, 29, 31

*Musacchio v. United States*, 577 U.S. 237 (2016) ............................................................ 30

*Puckett v. United States*, 556 U.S. 129 (2009) ..................................................... 10, 11, 28, 31

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004) ................................................ 11

*United States v. Frady*, 456 U.S. 152 (1982) ................................................................... 11

*United States v. Olano*, 507 U.S. 725 (1993) ........................................................... *passim*

*United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020) ............................................... 25

*United States v. Young*, 470 U.S. 1 (1985) ...................................................................... 11

*United States v. Askew*, 403 F.3d 496 (7th Cir. 2005) ................................. 13, 14, 24, 27

*United States v. Bek*, 493 F.3d 790 (7th Cir. 2007) ........................................................ 30

*United States v. Brown*, 726 F.3d 993 (7th Cir. 2013) ............................................ *passim*

*United States v. Canino*, 949 F.2d 928 (7th Cir. 1991) ................................................... 24

*United States v. Colon*, 549 F.3d 565 (7th Cir. 2008) ..................................... 16, 17, 18

*United States v. Cruse*, 805 F.3d 795 (7th Cir. 2015) .............................................. *passim*

*United States v. Davis*, 845 F.3d 282 (7th Cir. 2016) ...................................................... 23

*United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012) ................................................. 18

*United States v. Douglas*, 818 F.2d 1317 (7th Cir. 1987) ........................... 10, 12, 27, 29

*United States v. Fort*, 998 F.2d 542 (7th Cir. 1993) ....................................................... 15

*United States v. Gallegos*, 784 F.3d 1356 (10th Cir. 2015) ............................................ 18

*United States v. Gee*, 226 F.3d 885 (7th Cir. 2000) ................................................. *passim*

*United States v. Hidalgo-Sanchez*, 29 F.4th 915 (7th Cir. 2022) ....................... 19, 21, 22

*United States v. Johnson*, 437 F.3d 665 (7th Cir. 2006) ................................................. 14

*United States v. Johnson*, 592 F.3d 749 (7th Cir. 2010) ............................................ 15, 20

*United States v. Lechuga*, 994 F.2d 346 (7th Cir. 1993) (*en banc*) ............................... 21

*United States v. Love*, 706 F.3d 832 (7th Cir. 2013) .................................................. 14, 24

*United States v. McGill*, 815 F.3d 846 (D.C. Cir. 2016) ................................................ 18

*United States v. Melendez*, 401 F.3d 851 (7th Cir. 2005) ......................................... 25, 27

*United States v. Mims*, 92 F.3d 461 (7th Cir. 1996) ....................................................... 27

*United States v. Mitchell*, 596 F.3d 18 (1st Cir. 2010) ................................................... 18

*United States v. Pulgar*, 789 F.3d 807 (7th Cir. 2015) ......................................15, 20, 29
*United States v. Seigler*, 990 F.3d 331 (4th Cir. 2021) ................................................18
*United States v. Shavers*, 955 F.3d 685 (8th Cir. 2020)..............................................18
*United States v. Thomas*, 150 F.3d 743 (7th Cir. 1998)..........................................23, 30
*United States v. Vaughn*, 62 F.4th 1071 (7th Cir. 2023) ........................................21, 22
*United States v. Vizcarra-Millan*, 15 F.4th 473 (7th Cir. 2021)...................................13
*United States v. Wheat*, 988 F.3d 299 (6th Cir. 2021) ..........................................12, 18

Rules

Federal Rule of Criminal Procedure 52(a) ....................................................................10
Federal Rule of Criminal Procedure 52(b) .............................................................10, 27

Other Authorities

7th Cir. Pattern Crim. Jury Instructions (2023)....................................................14, 28

# INTRODUCTION

Royel Page was an established heroin dealer who worked closely with his supplier to keep heroin flowing to Page's customers. A federal wiretap captured a three-month snapshot of Page's heroin business, and he was charged with conspiracy and drug distribution. At trial, Page did not suggest that he was merely an arms-length buyer from his supplier; rather, Page argued that the voice recorded on the phone buying heroin from his supplier was not his at all.

On appeal, Page changed course, asserting a buyer-seller defense for the first time and criticizing the district court for not *sua sponte* instructing the jury on that defense. Blackletter principles of plain-error review foreclose that claim, and the panel erred in finding otherwise. But the panel's errors flowed, in part, from this Court's case law on the buyer-seller defense and plain-error review; some (but not all) of that case law has deviated from the Supreme Court's guidance and become difficult to apply.

While sitting *en banc*, this Court should correct the errors in the panel opinion and clarify the standards for the buyer-seller defense and plain-error review. Doing so would alleviate tensions within circuit case law and provide clearer guidance to district courts and parties, without breaking any new legal ground.

# STATEMENT OF THE ISSUE

Whether the trial judge plainly erred in failing to *sua sponte* provide a buyer-seller instruction.

# BACKGROUND

## I.     Factual Background

Beginning in early 2016, Royel Page purchased distribution quantities of heroin from Terrance Hamlin "about three times a week." Tr. 548-549. Hamlin was a long-time heroin dealer when he met Page; the two were introduced by Page's uncle, who explained to Hamlin that Page "had the potential to be better" in "the drugs sales and the drug game." Tr. 456. With that understanding, Hamlin accepted a phone call from Page, and the two men "started to do business in the drug, of heroin." Tr. 457.

Page initially purchased heroin from Hamlin for "$80 or $90 a gram," but Hamlin reduced the price "over time" because, as Hamlin explained, Page "moved it – he called me faster." Tr. 457. When Hamlin obtained heroin from his own supplier, Hamlin would "let [his supplier] know" if the order was from Page. Tr. 463; *see also* Tr. 547 (Hamlin discussing Page's quantity needs with Hamlin's supplier). Hamlin and Page discussed the drug business, with Hamlin offering Page "advice" on how to "protect his self and watch out for people who trying to be up into his business." Tr. 465. Hamlin called Page "neph"—short for

"nephew"—and Page called Hamlin "Uncle," although the two men were not related. Tr. 459-460.

Page and Hamlin had calls and meetings to arrange deals and exchange heroin hundreds of times between early 2016 and September of 2017. *See* Tr. 465; Tr. 548-549; PSR ¶ 28. For about three of those months, between April and June of 2017, part of Page's and Hamlin's business was captured on a wiretap. *See* PSR ¶ 28. That wiretap intercepted about 133 calls between Page and Hamlin concerning drug distribution. PSR ¶ 28. Those calls were introduced in evidence at Page's trial, and Hamlin testified about them at length.

The wiretap calls revealed that Page and Hamlin used an established system of coded language to discuss heroin varieties and quantities. *See, e.g.,* Tr. 471; PSR ¶ 29. The men often did not discuss price, as prices per gram were standardized between them. *See, e.g.,* Tr. 471. And generally, the calls reflected the sheer volume of Page's and Hamlin's dealings. *See, e.g.,* Tr. 484, 487-488 (court and parties struggling to streamline presentation of so many calls). Surveillance also confirmed that Page and Hamlin met in person shortly after conducting their sales over the phone, often at Page's home. *See, e.g.,* Tr. 406-407.

Some of the recorded calls reflected the close working relationship and trust between Page and Hamlin. On one occasion, for example, Hamlin advised Page to "keep Deion out our business" because Hamlin did not think Deion

could be trusted. Ex. 49A; Tr. 494. Hamlin explained to Page, "what I do with you, I, I, I can't do with them. You earned what you doing." Ex. 49A. Page was receptive: "I heard that, man. You right." Ex. 49A; *see also, e.g., id.* (HAMLIN: "I just want you to protect yo'self." PAGE: "Yeah, you right, though. …"). Hamlin encouraged Page's drug-dealing on other occasions as well; Hamlin told Page, for example, that he saw Page's "growth in the potential from the beginning of our drug-like dealings." Tr. 507.

The wiretap captured Page and Hamlin discussing the drug-trafficking business beyond the scope of any specific sale. For example, Hamlin asked Page to help him "twist"—*i.e.*, cut—heroin to facilitate Hamlin's expansion to a market "up north." Ex. 65A; Tr. 505-506. Page was initially agreeable: "Oh, yeah, man. Most definitely, most definitely. I can show you, I can show you the twist, man that ain't nothing, man." Ex. 65A; *see also* PSR ¶ 32. Hamlin explained that he had a Nigerian supplier who would only sell if Hamlin was "confident" he could quickly "twist" and resell the heroin, and Page replied, "I got you, bro. Man, we can do this, man." Ex. 65A; *see also, e.g., id*. (HAMLIN: "That's why I called you. I ain't call nobody else."). Later, however, Page told Hamlin that he (Page) was "the master" at twisting heroin and did not want to share his specific mix. Tr. 509; Ex. 66A.

At one point during the wiretap, Page purchased heroin from Hamlin that,

according to Page's testers, was "no good." Ex. 78A; *see* Tr. 520. Page elaborated: "Both of them telling me, man. That ain't test, man. … Like it take too long to boil down." Ex. 79A. Page asked Hamlin to "swap it out" for other heroin, explaining that "my people don't like this," including one dissatisfied buyer who "spends so I can't let him go, bro." Ex. 79A; *see* Tr. 522 (Hamlin testifying that Page was "trying to explain to me that he got a customer that buys his heroin and he spends good money that he can't afford to let him go with some bad stuff"). Hamlin agreed to take the heroin back. Tr. 523. Shortly thereafter, Page asked Hamlin if he could buy more heroin partially on credit ("If I can owe you the rest[?]"), to which Hamlin immediately agreed. Ex. 85A; *See* Tr. 524.

Law enforcement executed a search warrant at Page's home in September of 2017. PSR ¶ 34. There, they found Page discarding a substantial quantity of heroin down the toilet, and found drugs, drug-distribution paraphernalia, and thousands of dollars of cash. PSR ¶¶ 34-38; Tr. 307-338. They did not find indicia of personal drug use, such as needles, syringes, straws, rolled-up dollar bills, or burned aluminum foil. Tr. 349. Page subsequently told Hamlin that "he had got raided with the 50 grams [Hamlin] sold him at his house," and that Page had "tried to flush it down the commode." Tr. 550.

## II. Procedural History

In November of 2019, a grand jury in the Eastern District of Wisconsin returned a superseding indictment charging Page and others (including Hamlin and Hamlin's supplier) with a drug-trafficking conspiracy involving more than 100 grams of heroin, and charging Page with twelve counts of attempting to distribute and to possess with intent to distribute heroin. R. 303.

Page proceeded to trial, where the evidence included Hamlin's testimony and wiretap recordings, as well as expert testimony about drug-trafficking and evidence from the search of Page's residence. As relevant here, the Government's expert testified about drug-trafficking conspiracies, explaining how drug-traffickers work together to distribute drugs and reduce the risk of apprehension. Tr. 714-719. The expert explained the difference between user- and distribution-quantities of heroin, establishing that the quantities Page purchased from Hamlin were consistent with distribution. Tr. 727 (explaining that user quantities are about a gram or less); *compare* Tr. 548-549 (Hamlin testifying that he generally sold Page between 12.5 and 56 grams of heroin "about three times a week").

Page's defense at trial was, by and large, "that the phone calls are not him"; "it's, just simply, it wasn't me." Final Pretrial Conf. Tr. 35 (Page's attorney discussing case). That defense had the potential benefit of shielding Page not only from the conspiracy count, but from the twelve distribution counts as well,

each of which was predicated on recorded calls. Page's cross-examination of the case agent thus emphasized that Page had not been involved in any of the controlled buys and suggested that Page's and Hamlin's meetings could be explained by their friendship. Tr. 245-247; *see also* Tr. 420-421 (similar cross-examination of another law enforcement agent). Page's cross-examination of Hamlin challenged Hamlin's credibility, but Page's counsel did not ask Hamlin any questions focused on distinguishing a conspiratorial relationship from a buyer-seller relationship. Tr. 552-577. Page's Rule 29 motion similarly made no mention of a potential buyer-seller relationship. Tr. 737. Page's closing argument focused on his innocence overall, rather than advancing a buyer-seller argument. *See, e.g.*, Tr. 809 (describing Hamlin as "a liar and someone who expects a benefit … It's ridiculous. Saying who was on the phone with him."); Tr. 810 (emphasizing lack of controlled buys involving Page).

After the close of evidence, the court conducted a thorough jury-instruction conference and repeatedly confirmed that Page and his counsel were satisfied with the jury instructions. *See, e.g.*, Tr. 773. No one proposed to instruct the jury on the buyer-seller defense. The court did instruct the jury on the definition of a conspiracy, including that "[a] defendant is not a member of a conspiracy just because he knew and/or associated with people who were

involved in a conspiracy, knew there was a conspiracy, and/or was present during conspiratorial discussions." Tr. 843.

The jury convicted Page on all counts. Tr. 857-858. At sentencing, Page faced a Guidelines range of 97-121 months' imprisonment. *See* PSR ¶¶ 52, 122. The court imposed a below-Guidelines sentence of 90 months' imprisonment. R. 593.

This appeal followed. After initial briefing and argument, a panel of this Court held that the trial judge had plainly erred by not *sua sponte* instructing the jury about the difference between a buyer-seller relationship and a drug-trafficking conspiracy. The Court then issued an order *sua sponte* granting rehearing *en banc* and directing the parties to file briefs "addressing the following question, in addition to any other points they wish to raise: Whether the trial judge plainly erred in failing to sua sponte provide a buyer-seller instruction." The Court directed the parties to "address whether the record reflects presentation of a buyer-seller theory and the role of the party-presentation principle in the district court," as well as to discuss specific cases.

# ARGUMENT

## The Trial Judge Did Not Plainly Err By Omitting A Buyer-Seller Instruction.

Royel Page did not advance a buyer-seller defense, and the evidence against him did not reveal a buyer-seller relationship. The district court therefore did not plainly err in instructing the jury on the normal requirements of a conspiracy, without *sua sponte* adding a buyer-seller instruction. As this case reflects, some of the buyer-seller and plain-error case law in this Circuit has become difficult to apply, and the Court should clarify it.

## I. The Standards For Plain-Error Review Are Demanding And Must Be Applied Consistently.

The standards for plain-error review are derived from Federal Rule of Criminal Procedure 52(b), which provides that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b). A defendant seeking discretionary relief under that rule must make four showings. At the threshold, a defendant must show (1) "error," (2) "that is 'plain,'" and (3) "that 'affect[s] substantial rights.'" *United States v. Olano*, 507 U.S. 725, 732 (1993). To "affect substantial rights," there "must be 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Greer v. United States*, 593 U.S. 503, 507-508 (2021); *see, e.g., United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir. 1987) ("Plain error must be of such a great magnitude that it probably changed the

9

outcome of the trial."). When all three of those threshold requirements are satisfied, "the court of appeals has authority to order correction, but [it] is not required to do so." *Olano*, 507 U.S. at 735. Instead, a reviewing court "may grant relief if it concludes that the error had a serious effect on 'the fairness, integrity or public reputation of judicial proceedings.'" *Greer*, 593 U.S. at 508.

The "defendant has the burden of establishing each of the four requirements for plain-error relief." *Greer*, 593 U.S. at 508. "Meeting all four prongs is difficult, 'as it should be,'" *Puckett v. United States*, 556 U.S. 129, 135 (2009), because "[r]eversing a conviction on the basis of an error that the defendant's lawyer failed to bring to the judge's attention is inconsistent with the premises of an adversary system and disruptive of the efficient operation of the criminal justice system," *Douglas*, 818 F.2d at 1320. And "federal courts have no more discretion to disregard [Rule 52]'s mandate than they do to disregard constitutional or statutory provisions." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988); *see id.* at 254 (holding "that a federal court may not invoke supervisory power to circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a)"). The courts of appeal therefore have "no authority" to make exceptions to Rule 52(b)'s plain-error requirements, even for constitutional claims. *Johnson v. United States*, 520 U.S. 461, 466 (1997).

Rule 52(b) strikes a "careful balanc[e]" between "our need to encourage all

trial participants to seek a fair and accurate trial the first time around [and] our insistence that obvious injustice be promptly redressed." *United States v. Frady*, 456 U.S. 152, 163 (1982). The rule "serves to induce the timely raising of claims and objections, which gives the district court"—the court that "is ordinarily in the best position to determine the relevant facts and adjudicate the dispute"— "the opportunity to consider and resolve" the objections. *Puckett*, 556 U.S. at 134. It also "reduce[s] wasteful reversals by demanding strenuous exertion to get relief for unpreserved error." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004). And it reduces opportunities for gamesmanship—such as presenting one defense at trial, and then seeking a new trial based on another defense entirely. *See, e.g., Puckett*, 556 U.S. at 134. At the same time, however, the rule "tempers the blow of a rigid application of the contemporaneous-objection requirement," *United States v. Young*, 470 U.S. 1, 15 (1985), by preserving to a reviewing court's "sound discretion" a "limited power to correct errors that were forfeited because not timely raised," *Olano*, 507 U.S. at 731-732.

## II. The Standards For Plain-Error Review Are Not Met Here.

Plain-error analysis "is successfully employed only in the most compelling case," and this is not such a case. *Douglas*, 818 F.2d at 1320. The Government thus respectfully contends that the panel decision erred. But the panel's errors at the

first and third prongs of plain-error review had some support in this Court's

precedents, which this Court, sitting *en banc*, can now redress.

**A.** *Prong One***: The District Court Did Not Err, But Some Of This Court's Cases Suggest Otherwise.**

The first prong of plain-error review simply asks whether the district court

erred, without regard to whether the claim was preserved. Answering that

question here is difficult under this Court's buyer-seller case law. Some cases

from the Supreme Court and this Court suggest that no error occurred; another

line of this Court's more recent cases points the other way. Under a correct

application of the buyer-seller doctrine, however, there was no error.

*1. The Buyer-Seller Doctrine*

The distinction between a buyer-seller agreement and a conspiracy is vital

to shield drug-users and spot buyers from liability for a drug-trafficking

conspiracy in which they played no part. Every circuit has thus "adopted some

form of a 'buyer-seller' rule.'" *United States v. Wheat*, 988 F.3d 299, 307 (6th Cir.

2021). The doctrine's conceptual foundations come from *Direct Sales Co. v. United

States*, in which the Supreme Court explained that a conspiracy does not arise

simply because one person sells goods to another "know[ing] the buyer will use

the goods illegally." 319 U.S. 703, 709 (1943). Rather, the "gist of conspiracy" in

such a circumstance is that the seller not only "knows the buyer's intended

illegal use" but also "show[s] that by the sale he intends to further, promote and cooperate in it." *Id.* at 711.

To assist the jury in distinguishing between a drug-trafficking conspiracy and a buyer-seller relationship, "'district courts should give a 'buyer-seller' instruction ... where the jury could rationally find, from the evidence presented, that the defendant merely bought or sold drugs but did not engage in a conspiracy.'" *United States v. Cruse*, 805 F.3d 795, 814 (7th Cir. 2015). While that rule sounds straightforward, its application to specific cases has proved difficult. In this Circuit, at least, the "line between a buyer-seller relationship and a drug conspiracy" is "blurry," *United States v. Askew*, 403 F.3d 496, 503 (7th Cir. 2005), "difficult to discern," *United States v. Gee*, 226 F.3d 885, 895 (7th Cir. 2000), and "challenging for judges and juries," *United States v. Vizcarra-Millan*, 15 F.4th 473, 507 (7th Cir. 2021). As lower courts have struggled to draw that line, this Court's buyer-seller case law has proliferated, and intra-Circuit "tension[s]" have developed. *United States v. Brown*, 726 F.3d 993, 1001 (7th Cir. 2013); *see, e.g., id.* at 1000 ("For example, does a *single* transaction, in a wholesale quantity, on credit, permissibly support an inference of conspiracy? We have cases that answer both ways, each supporting its conclusion with other case-specific considerations."); *id.* at 1000-1001 ("Yet another series of cases disagree over whether a credit arrangement alone is sufficient to infer conspiracy."). The pattern jury

instructions observe "the immense challenge of trying to craft a jury instruction that captures [the Seventh Circuit's] case law on buyer-seller relationships." 7th Cir. Pattern Crim. Jury Instructions 5.10(A) cmt. (2023).

In several cases, this Court has "upheld district courts that have declined to give the instruction in the face of strong evidence of a conspiratorial agreement"—evidence similar to the evidence in this case. *Cruse*, 805 F.3d at 814; *see id.* at 814-815 (collecting cases, which follow here); *United States v. Love*, 706 F.3d 832, 839 (7th Cir. 2013) (evidence included phone logs, videotapes, audio recordings, and testimony from an informant and law enforcement officer); *United States v. Johnson*, 437 F.3d 665, 669 (7th Cir. 2006) (evidence included audio recordings showing that the defendant acted as a broker for his coconspirator, as well as evidence from controlled buys); *Askew*, 403 F.3d at 504 (record included direct surveillance of drug deals, evidence that the defendant received drugs at below-market prices, and other evidence linking the defendant to his coconspirator); *United States v. Fort*, 998 F.2d 542, 543 (7th Cir. 1993) (wiretap and surveillance evidence documenting the defendant's cooperation with his coconspirator). In "each of those cases," the Court "reviewed the entire record and upheld the denial of the instruction based on strong, direct evidence of conspiracy (e.g., videotapes, audio recordings, surveillance, controlled buys, informant testimony) and the absence of any record support for a buyer-seller

relationship." *Cruse*, 805 F.3d at 815. As discussed further below, the same result is warranted here.

But other cases, like the panel decision, point the other way. In *United States v. Pulgar*, for example, this Court found the evidence insufficient to distinguish a conspiracy from a buyer-seller relationship even though "Pulgar, no doubt, sold large quantities of cocaine to Schmidt at wholesale prices for a period of eleven years." 789 F.3d 807, 813 (7th Cir. 2015). In *Cruse*, the Court held that the trial judge should have issued the buyer-seller instruction requested by the defendant even though four admitted co-conspirators "testified that they engaged in drug transactions with" him, including some sales "on credit." 805 F.3d at 815. *See also, e.g., United States v. Johnson*, 592 F.3d 749, 754-758 (7th Cir. 2010) (repeated purchases of wholesale quantities of drugs, "large volume of phone calls" that "established a prolonged relationship of mutual trust," recorded calls showing a discount on pricing and a warning about law enforcement, insufficient to prove conspiracy).

The cases in the latter group reflect the Court's concern that the traditional evidence of drug-trafficking conspiracies — a "'prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture," "the length of affiliation, the established method of payment, ... the extent to which the transactions are standardized, and the

demonstrated level of mutual trust," *Gee*, 226 F.3d at 894—does not "actually distinguish conspiracies from buyer-seller relationships." *Brown*, 726 F.3d at 999. That concern originated in *United States v. Colon,* which analogized repeated, standardized, distribution-quantity drug transactions to "regular" and "standardized" purchases from legitimate businesses (like Wal-Mart), and concluded that "repeat [drug] transactions need not imply greater mutual trust than is required in any buyer-seller relationship." 549 F.3d 565, 567–568 (7th Cir. 2008); *see Brown*, 726 F.3d at 999 (describing *Colon*'s influence on Circuit law, and providing example: if a customer "buy[s] two sticks of deodorant for $3.49 each, every other Friday" from Wal-Mart, these transactions, "despite exhibiting frequency, regularity, and standardization, do not evince the substantial relationship entailed in a conspiracy").

Following *Colon*'s reasoning, some of this Court's more recent cases have suggested that even long-term, standardized, distribution-quantity transactions exhibiting mutual trust and a shared awareness of further distribution cannot demonstrate a conspiracy. Those cases have additionally required evidence of "sales on credit or consignment, an agreement to look for other customers, a payment of commission on sales, an indication that one party advised the other on the conduct of the other's business, or an agreement to warn of future threats

to each other's business stemming from competitors or law-enforcement authorities." *Id.*

*Colon*'s reasoning, however, is in considerable tension with the Supreme Court's reasoning in *Direct Sales*. There, the Supreme Court emphasized the "important" "difference" between transactions in "articles of free commerce" and articles "inherently ... susceptibl[e] to harmful and illegal use": Evidence "which would be wholly innocuous or not more than ground for suspicion in relation to unrestricted goods, may furnish conclusive evidence, in respect to restricted articles, that the seller knows the buyer has an illegal object and enterprise," and that knowledge "is the foundation of intent." 319 U.S. at 711-712. In the context of restricted items like drugs, tactics like "bargain counter discounts" and large volume sales serve only to "increase illegal demand and consumption," supporting the inference that buyer and seller are "working in prolonged cooperation" to illegally distribute narcotics. *Id.* at 712-713. In these circumstances, buyer and seller have a shared "'stake in the venture,' which, even if it may not be essential, is not irrelevant to the question of conspiracy"; specifically, the seller's "stake [is] in making the profits which [he] knew could come only from [his] encouragement of [the buyer's] illicit operations." *Id.* at 713. That is a conspiracy, even if the agreement "was a tacit understanding, created by a long course of conduct and executed in the same way," and even if "the

overt acts consist solely of sales" with distinctive "volume, frequency and prolonged repetition." *Id.* at 714-715.

Returning to the core principles outlined in *Direct Sales* would resolve this intra-circuit tension on the buyer-seller doctrine.[1] Those principles establish that repeated transactions in wholesale quantities of illegal drugs, between people who exhibit mutual trust, a shared awareness of further distribution, and a standardized working relationship over time, are evidence of a drug-trafficking conspiracy and not an arms-length buyer-seller relationship.

### 2. *The Evidence In This Case*

Under the correct legal standards, there was no error in the jury instructions here, because Page's jury could not reasonably find "that the defendant merely bought or sold drugs but did not engage in a conspiracy.'" *Cruse*, 805 F.3d at 814. Indeed, the evidence at Page's trial included not only the traditional indicia of conspiracy, but also several of the additional factors this Court has focused on since *Colon*.

---

[1] Relatedly, some of this Court's buyer-seller case law has diverged from the law of other circuits. *See* Panel Op. 5-6 n.1; *see, e.g., United States v. Seigler*, 990 F.3d 331, 338 (4th Cir. 2021); *Wheat*, 988 F.3d at 308 (6th Cir. 2021); *United States v. Shavers*, 955 F.3d 685, 696 (8th Cir. 2020); *United States v. McGill*, 815 F.3d 846, 929–930 (D.C. Cir. 2016); *United States v. Gallegos*, 784 F.3d 1356, 1360 (10th Cir. 2015); *United States v. Delgado*, 672 F.3d 320, 333 (5th Cir. 2012); *United States v. Mitchell*, 596 F.3d 18, 24–25 (1st Cir. 2010).

a.    Audio recordings, surveillance, expert testimony, and testimony from Page's co-conspirator Hamlin all established that—in Hamlin's own words—Page and Hamlin "d[id] business in the drug, of heroin," together. Tr. 457. For more than a year and a half, Hamlin sold distribution quantities of heroin to Page multiple times per week, for Page to resell, as the two men explicitly discussed. *See, e.g.*, Ex. 79A, Tr. 522. Page benefited from a volume discount because, as Hamlin explained, Page "moved" the heroin quickly. Tr. 457. When Page's customers were unhappy, Hamlin took remedial measures, allowing Page to return low-quality heroin. Tr. 523; *see, e.g., United States v. Hidalgo-Sanchez*, 29 F.4th 915, 926–927 (7th Cir. 2022) (observing that "[t]he ability to return unsold drugs is the hallmark of a consignment," which "illustrates that the two had a shared stake in the further sale of the heroin and were working out a solution together," based on one wiretapped instance of returned drugs). When Page proposed to pay for heroin partially on credit, Hamlin said, "Man, you know how we do it. That ain't no, no damn major problem." Ex. 85A; *see* Tr. 524. Hamlin offered Page advice about Page's drug-selling business, including about potential threats from others in the business, and the men discussed a possible expansion of their partnership. *See, e.g.*, Tr. 465; Ex. 65A. They spoke in an established code, engaged in *hundreds* of standardized transactions, and

generally exhibited "a heightened level of trust indicative of a drug-distribution conspiracy," *Pulgar*, 789 F.3d at 816.

The evidence thus included many of the hallmarks of a drug-distribution conspiracy: "sales of large quantities of drugs, repeated and/or standardized transactions, and a prolonged relationship between the parties," as well as instances of "sales on credit or consignment, … an indication that one party advised the other on the conduct of the other's business, or an agreement to warn of future threats to each other's business stemming from competitors." *Johnson*, 592 F.3d at 754-756. In a wiretap case like this one, recorded calls that capture a portion of the defendants' drug business—including isolated instances of credit or consignment transactions—can support "reasonabl[e]" "inference[s]" about "the way [defendants] worked together" more broadly, and that was the case here. *Hidalgo-Sanchez*, 29 F.4th at 926. At bottom, the evidence against Page could not rationally be interpreted as showing "a series of spot dealings at arm's length between dealers who have no interest in the success of each other's enterprise"; to the contrary, it showed that Hamlin and Page knew their drug transactions enabled further distribution and "join[ed] both mind and hand" to make that possible. *United States v. Lechuga*, 994 F.2d 346, 349–350 (7th Cir. 1993) (*en banc*) (quoting *Direct Sales,* 319 U.S. at 713). That is a quintessential drug-trafficking conspiracy, not a buyer-seller relationship.

b.     The panel opinion nonetheless found the evidence of conspiracy "comparatively thin" and consistent with a buyer-seller relationship. Panel Op. 10. The panel reached that conclusion by compartmentalizing the Government's evidence into "three main pieces"—a "single instance when Hamlin allowed Page to return tainted heroin," their "unfulfilled discussion" about twisting heroin, and Hamlin's warning about "Deon"—and finding each insufficient to demonstrate a conspiracy. Panel Op. 7-9. In the Government's view, that analysis reflects the "persistent error" of dividing-and-conquering evidence rather than viewing it as a whole. *United States v. Vaughn*, 62 F.4th 1071, 1072 (7th Cir. 2023). "[T]he whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018)).

That rule is especially important in distinguishing buyer-seller relationships from drug-trafficking conspiracies. By its very nature, a "*mere* buyer-seller relationship" is reflected in spot transactions and isolated dealings, while a conspiracy is generally proven through the "totality of the circumstances," including numerous interactions between co-conspirators. *Hidalgo-Sanchez*, 29 F.4th at 927 (emphasis added). Compartmentalizing the Government's evidence will, as a result, always put a thumb on the scale in favor of finding a buyer-seller relationship. This Court has thus warned against

21

"los[ing] sight of the larger picture" in distinguishing conspiracies from buyer-seller relationships. *Brown*, 726 F.3d at 1002.

The broader focus makes a difference in this case, where the "totality of the circumstances" shows "a relationship between [Hamlin and Page] that was much deeper and more entwined than a mere buyer-seller relationship." *Hidalgo-Sanchez*, 29 F.4th at 927. No rational jury, having listened to Hamlin's testimony, a barrage of recorded calls about drug trafficking, testimony about surveillance of Hamlin and Page together, and expert testimony about drug-distribution conspiracies, could conclude that Page and Hamlin were merely conducting hundreds of arms-length, "episodic" transactions. *United States v. Thomas*, 150 F.3d 743, 745 (7th Cir. 1998). A buyer-seller instruction was therefore not required.

### B. *Prong Two*: Any Error Was Not "Plain."

Even if there was error here, it was not "plain." "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" *Olano*, 507 U.S. at 734. As described above, the evidence in this case did not "obvious[ly]" cry out for a buyer-seller instruction.

Page's decision not to present a buyer-seller defense at trial makes it impossible for him to demonstrate "plainness" in this appeal. Page pursued a different defense entirely, one that could have led to his exoneration on *all*

charges had the jury believed it. He did not raise a buyer-seller defense in the alternative. When given an opportunity to challenge the evidence of conspiracy, Page disavowed it: Because the Government's case encompassed out-of-court statements by Page's co-conspirators, the trial judge found by a preponderance of the evidence that "the conspiracy alleged in the superseding indictment existed; [and] that the defendant and the declarants were involved in that conspiracy." Tr. 586; *see, e.g., United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016) (required evidentiary finding). Page agreed that "the caselaw is … in line with [that] finding." Tr. 587. *Contrast Gee*, 226 F.3d at 894–896 & n.8 (finding plain error in failure to give buyer-seller instruction when, in conducting same evidentiary analysis, the "district court found that the government had *not* shown, by a preponderance of the evidence, that a conspiracy existed between the defendants") (emphasis added).

Given the strength of the conspiracy evidence in this case and Page's decision not to advance a buyer-seller defense, it would have been odd—and potentially confusing—for the judge to *sua sponte* add a buyer-seller instruction. *See, e.g., Cruse*, 805 F.3d at 814 ("an irrelevant instruction would only serve to confuse the jury and need not be given"). And this Court has "repeatedly held that a buyer-seller instruction is unnecessary where the instruction would contradict the defendant's theory of the case." *Love*, 706 F.3d at 839; *see, e.g.,*

*Askew*, 403 F.3d at 504-505 ("The strength of the government's case, combined with Askew's choice not to present or argue any evidence tending to show he was involved in a buyer-seller relationship only, leads us to conclude that there was no clear error in not sua sponte giving a buyer-seller instruction."); *United States v. Canino*, 949 F.2d 928, 941 (7th Cir. 1991) (when "the trial transcript is void of any assertion by any of the defendants that they were merely buyers or sellers," a buyer-seller instruction "would have been an absurdity given the evidence").

The trial judge appropriately allowed the evidence and Page's defense to shape this case for the jury. That approach was consistent with the fundamental premise of our adversarial system that "[parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (alterations in original). Out of respect for that "principle of party presentation," federal judges "do not, or should not, sally forth each day looking for wrongs to right." *Id.* Had the trial judge done what Page now contends was "obvious"—to *sua sponte* insert a buyer-seller issue into Page's trial—he would have violated that principle.

## C. *Prong Three*: There Is No Effect On Substantial Rights.

Page also has not carried his burden of demonstrating that, if the district court had included the buyer-seller instruction, "there is a 'reasonable probability' that he would have been acquitted." *Greer*, 593 U.S. at 508. A "reasonable probability" "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *see also, e.g., United States v. Melendez*, 401 F.3d 851, 855 (7th Cir. 2005) (claim that "district court should have *sua sponte* given a buyer-seller jury instruction" "must … fail if it does not appear that had the instruction been given, acquittal would have been substantially likely").

As described above, the evidence of conspiracy presented at trial was strong. And the record—including the evidence presented at trial and sentencing—is devoid of *any* tell-tale indicia of a buyer-seller relationship, such as evidence that Page was a heroin user himself, or evidence that Page ever bought heroin from anyone other than Hamlin. *See Greer*, 593 U.S. at 511 (holding that "the *entire* record" should be considered in "conducting plain-error review," and noting that it is "not … realistic" to "assume a scenario where the proper instruction was given, but where the Government did not introduce additional evidence" to address that instruction). On this record, it is no surprise that Page did not choose to present a buyer-seller defense; it had little chance of success.

25

The panel opinion did not fully engage with this element of plain-error review. Instead, the opinion (following Page's briefing, *see* Opening Br. 18) cited *Cruse* for the principle that "we have never found a failure to give the buyer-seller instruction to be harmless." Panel Op. 6 (quoting *Cruse*, 805 F.3d at 816); Panel Op. 10 (same). But *Cruse* was not a plain-error case. Instead, the defendant in *Cruse* had requested a buyer-seller instruction, and this Court reviewed its denial "de novo." 805 F.3d at 814. There is an "important difference" between *Cruse*'s harmlessness analysis and the third prong of plain-error review: On plain-error review, "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Olano*, 507 U.S. at 734; *see also Greer*, 593 U.S. at 512 ("this Court's precedents have long drawn a bright line between harmless-error and plain-error review based on preservation"). It would be quite surprising if, as the panel suggested, this Court had "never found a failure to give the buyer-seller instruction to be harmless" on *plain-error* review—and the Court has, in fact, so found. *See, e.g.*, *Askew*, 403 F.3d at 505; *Melendez*, 401 F.3d at 855.

In the panel's defense, however, other buyer-seller cases from this Circuit have similarly misapplied the third prong of plain-error review. To be sure, many cases correctly require the defendant to show a "substantial … likelihood" that "he would have been acquitted" had the court instructed the jury on the

buyer-seller defense. *Greer*, 593 U.S. at 508; *Cullen*, 563 U.S. at 189; *see, e.g., Askew*, 403 F.3d at 505; *Melendez*, 401 F.3d at 855; *Douglas*, 818 F.2d at 1320. But others appear not to hold defendants to that burden, instead reversing based on uncertainty about whether a buyer-seller instruction would have made a difference. *See, e.g., United States v. Mims*, 92 F.3d 461, 466 (7th Cir. 1996) (acknowledging that on plain-error review, "the defendant must *ordinarily* show that the error 'affected the outcome …,'" but nonetheless finding omission of buyer-seller instruction to be plain error when "it is impossible for anyone who did not sit in the jury room to know") (emphasis added); *see also Gee*, 226 F.3d at 895-896 (finding plain error when "[w]e have no way of knowing whether" the verdict would have differed with a buyer-seller instruction). While sitting *en banc*, this Court should clarify that the latter approach is incorrect. *See Puckett*, 556 U.S. at 135 ("We have repeatedly cautioned that '[a]ny unwarranted extension' of the authority granted by Rule 52(b) would disturb the careful balance it strikes between judicial efficiency and the redress of injustice[.]").

Correct application of the third plain-error prong to this case is not difficult. Page has not, and cannot, show a substantial likelihood of acquittal on Count One had his jury received the buyer-seller instruction. The jury heard evidence of hundreds of transactions, over a period of one-and-a-half years, in distribution quantities of heroin; three months of recorded calls capturing

examples of a partial-credit sale, a consignment-type return of drugs, the

provision of advice, and discussions of expansion; and Hamlin's own extensive

testimony. The buyer-seller instruction, which emphasizes that "[t]he

government must prove that the buyer and seller had the joint criminal objective

of further distributing [heroin] to others," would not have changed the verdict.

7th Cir. Pattern Crim. Jury Instructions 5.10(A).

### D. *Prong Four*: There Is No Serious Effect On Fairness, Integrity, Or Public Reputation Of Judicial Proceedings.

Finally, Page has not shown, and cannot show, that the omission of a

buyer-seller instruction "'seriously affect[ed] the fairness, integrity, or public

reputation of judicial proceedings.'" *Johnson,* 520 U.S. at 467. That too is fatal to

his claim, as reversal on plain-error review "is justifiable only when a reviewing

court is convinced that it is necessary in order to avert an actual miscarriage of

justice." *Douglas*, 818 F.2d at 1320.

When the defendant has challenged a missing buyer-seller instruction,

applying the fourth prong of plain-error review can be "difficult" if "the

evidence was sufficient to support a conspiracy conviction." *Gee*, 226 F.3d at 896.

Here, the evidence was more than sufficient to support a conspiracy conviction,

as discussed above and in the Government's opening brief.[2] In this circumstance,

---

[2] Page's appeal challenged the sufficiency of the evidence of conspiracy. *See* Opening Br. 11-15. The panel did not reach that question, instead remanding for

a defendant might nonetheless satisfy the fourth prong if "the existence of a

conspiratorial agreement was closely contested and conflicting evidence was

presented on the issue" at trial. *Id.* Here, however, the opposite was true: The

existence of a conspiratorial agreement was not contested at all, and Page did not

present any argument or evidence tending to suggest that he had a mere buyer-

seller relationship with Hamlin (nor did the Government). In addition, Page

remains convicted of twelve counts of drug distribution, which were unaffected

by the alleged instructional error. *Cf. Thomas*, 150 F.3d at 747 (Easterbrook, J.,

---

a new trial on the conspiracy count. Panel Op. 10. That approach was not correct: If the Government's evidence was actually insufficient, Page should be acquitted of Count One rather than retried. *See Burks v. United States*, 437 U.S. 1, 15-17 (1978). The Court did not seek *en banc* briefing on this question. For the reasons discussed herein and in the Government's opening brief, however, the evidence was more than sufficient to support the jury's verdict on Count One, and the Court should so hold.

In doing so, the Court should apply the normal standards for sufficiency-of-the-evidence review. *See, e.g., Musacchio v. United States*, 577 U.S. 237, 243 (2016). The Court should eschew the "unique" standard for sufficiency review that it has used in some buyer-seller cases. *Pulgar*, 789 F.3d at 812. *Compare, e.g., United States v. Bek*, 493 F.3d 790, 798 (7th Cir. 2007) (this Court "do[es] not weigh the evidence" when conducting sufficiency review, and instead "view[s] the evidence in a light most favorable to the government and reverse[s] only when there is no evidence, no matter how it is weighed, from which a rational jury could find guilt beyond a reasonable doubt"); *with Pulgar*, 789 F.3d at 812 (stating that buyer-seller cases are "special" because the Court will weigh the evidence and "overturn a conviction when the plausibility of a mere buyer-seller arrangement is the same as the plausibility of a drug-distribution conspiracy"). Like the standards for plain-error review, the standards for sufficiency review are mandated by Supreme Court precedent and should be applied consistently, including in buyer-seller cases.

concurring) ("when deciding whether the proceedings during trial were so flawed that a court should relieve a defendant of his forfeiture, judges ought to consider what is apt to happen next," including a conviction on substantive distribution counts).

Under this Court's established precedents, Page cannot demonstrate that the omission of a buyer-seller instruction "'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings.'" *Johnson*, 520 U.S. at 467. The panel opinion neglected to mention this factor. To the extent the panel assumed this requirement was satisfied when a buyer-seller instruction is omitted, that was error: This criterion "is meant to be applied on a case-specific and fact-intensive basis" rather than through the use of "'per se'" rules. *Puckett*, 556 U.S. at 142.

## CONCLUSION

The district court did not plainly err in omitting a buyer-seller instruction in this case, and the Government therefore respectfully contends that the panel decision erred. While sitting *en banc*, this Court should clarify its buyer-seller case law, reaffirm that the normal doctrines of appellate review apply to buyer-seller claims, and affirm the judgment below.

Respectfully submitted,

GREGORY HAANSTAD
United States Attorney

REBECCA TAIBLESON
Assistant U.S. Attorney

United States Attorney's Office
Eastern District of Wisconsin
517 E. Wisconsin Ave.
Suite 530
Milwaukee, WI  53202
(414) 297-4534

Dated: February 23, 2024                    Attorneys for Plaintiff-Appellee

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the length limitation set by the Court's order of December 20, 2023, because it contains 6,986 words according to the word-processing system used to prepare the brief.

s/Rebecca Taibleson
REBECCA TAIBLESON
Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2024, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF System. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*s/Rebecca Taibleson*
REBECCA TAIBLESON
Assistant United States Attorney

530 United States Courthouse
517 E. Wisconsin Ave, Room 530
Milwaukee, WI 53202
(414) 297-1700